**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MATTHEW KREUSER, derivatively on behalf of GOHEALTH, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CLINTON P. JONES, TRAVIS J. MATTHIESEN, BRANDON M. CRUZ, JOSEPH G. FLANAGAN, HELENE D. GAYLE, JEREMY W. GELBER, ANITA V. PRAMODA, MIRIAM A. TAWIL, and ALEXANDER E. TIMM, <br><br> Defendants, <br><br> and <br><br> GOHEALTH, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) BREACH OF FIDUCIARY DUTY (2) UNJUST ENRICHMENT; (3) WASTE OF CORPORATE ASSETS; AND (4) CONTRIBUTION UNDER SECTION 11(f) OF THE SECURITIES ACT OF 1933 AND 21D OF THE SECURITIES EXCHANGE ACT OF 1934.** <br><br> JURY TRIAL DEMANDED |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Matthew Kreuser ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant GoHealth, Inc. ("GoHealth" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Clinton P. Jones ("Jones"), Travis J. Matthiesen ("Matthiesen"), Brandon M. Cruz ("Cruz"), Joseph G. Flanagan ("Flanagan"), Helene D. Gayle ("Gayle"), Jeremy W. Gelber ("Gelber"), Anita V. Pramoda ("Pramoda"), Miriam A. Tawil ("Tawil"), and Alexander E. Timm ("Timm") (collectively, the "Individual Defendants," and together with GoHealth, the "Defendants") for breaches of their

1

fiduciary duties as directors, officers, and/or controlling shareholders of GoHealth, unjust enrichment, waste of corporate assets, and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GoHealth, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by GoHealth's directors, officers, and/or controlling shareholders from July 14, 2020 through the present (the "Relevant Period") based on misleading statements and omissions made in connection with the Company's July 2020 initial public offering of stock (the "IPO"), and subsequent failures to correct them.

2.      The Company was formed on March 27, 2020, and was the issuer of stock in the IPO pursuant to the Offering Documents. Although it was formally organized only right before the IPO, the Company has operated since 2001. The Company is a holding company and through an intricate corporate structure, its operating business is taken on by Norvax, LLC ("Norvax"), which is a wholly-owned subsidiary of Blizzard Midco, LLC, which, in turn, is a wholly-owned subsidiary of GoHealth Holdings, which, in turn, is a wholly-owned subsidiary of GoHealth.

3.     In September 2019, private equity firm Centerbridge Partners, L.P. ("Centerbridge") acquired 100% of the equity in Norvax and, together with the Company's co-founders, took control of GoHealth. To date, the Company is a controlled company, with Centerbridge and the Company's co-founders owning the majority of Company stock and exercising control over its Board of Directors ("Board").

4.     The Company is a health insurance marketplace that utilizes a mixture of websites and licensed agents to assist individuals in registering for health insurance with carriers. GoHealth has the following four business segments: (a) Medicare-Internal; (b) Medicare-External; (c) Individual and Family Plans ("IFP") and Other-Internal; and (d) IFP and Other-External.

5.     For years prior to the IPO, the Company had changed its concentration to registering individuals for Medicare plans, specifically Medicare Advantage plans.[1] This approach allowed the Company to grow rapidly prior to the IPO even in a competitive market. In the Offering Documents (defined below), the Company highlighted that its change to Medicare permitted GoHealth to take advantage of "strong demographic trends," since enrollment in Medicare was projected to increase from about 61 million people in 2019 to about 77 million people by 2028 and more and more individuals opting for Medicare Advantage plans.

6.     The Offering Documents stated that the Company projected a "total addressable market" of $28 billion for Medicare Advantage and Medicare Supplement products. The Offering Documents also stated that the trends in the Medicare market were ready to "drive a larger market

---

[1] Medicare Advantage is a health insurance plan that offers Medicare benefits by way of a private-sector health insurer. In a Medicare Advantage plan, a Medicare enrollee pays a monthly premium to a private insurance company in exchange for coverage for inpatient hospital and outpatient services. Generally, the plan also includes coverage for prescription drugs.

in the coming years" and that combined with the Company's "other product and plan offerings," they would produce an even bigger potential market.

7.      In the Offering Documents, the Company depicted GoHealth as ready to disturb the traditional face-to-face, agent-driven insurance sales market, and particularly in Medicare, by utilizing the Company's technological platform as a marketplace.

8.      Using the Company's platform to shop for insurance is free for consumers. The Company generally generates revenue through collecting commission fees from the insurance carriers upon a consumer enrolling in a carriers' plan through the Company. Further, the Company receives recurring commissions so long as the individual consumers keep their insurance plans with the carrier. Thus, customer "persistency" (described as customers remaining enrolled in their health insurance plans) was essential to combat "churn," (referring to individuals who leave a carrier's plan to sign up for a plan with a competitor carrier).

9.      The Offering Documents lauded the Company's "strong" relationships with top-tier carriers and long history of "industry-leading" growth. Specifically, the Offering Documents cited to the Company's 52% compound annual growth rate between 2003 and 2019. Moreover, the Offering Documents touted the Company's rapid growth in the years immediately prior to the IPO and explained that the Company's recent concertation on Medicare segments had played a major part in GoHealth's substantial growth—which, together account for the majority of its revenues and profits.

10.     Although GoHealth's vital Medicare-Internal segment, was responsible for the tremendous growth in the Company's revenues, it was heavily concentrated on only two insurance carriers: Humana Inc. ("Humana") and Anthem, Inc. ("Anthem"). For instance, in 2019, Humana and Anthem made up 40% and 20%, respectively, of GoHealth's total revenues and in the period

ended March 31, 2020, they made up approximately 74% of GoHealth's total revenues, an increase from 43% year-over-year.

11.    The Offering Documents stated that it was best in class regarding its critically important financial metric that divides the lifetime value of commissions that the Company projected that it would receive per submission that was approved by the insurance company ("LTV") by the cost to convert a prospective customer into an actual one that signs up for an insurance policy with a carrier ("CAC"). Thus, LTV/CAC measures the Company's commissions in comparison to its costs of acquiring customers. However, despite the import of the metric, the complexity of the calculations (as well as the fact that the Company did not report several of the metrics underlying the LTV/CAC) made it effectively impossible for investors to comprehend precisely how it was calculated for one fiscal quarter compared with another or to calculate it themselves.

12.    Notwithstanding, the Company clearly makes use of real-time data analysis to understand the Company's financial performance of its day-to-day operations, and specifically how those changes would affect the Company's LTV/CAC. For example, as a selling point to investors, GoHealth highlighted that the Company, in real time, collects data on all aspects of its business.

13.    On June 19, 2020, the Company filed a draft registration statement with the SEC on Form S-1 (as amended, the "Registration Statement"). The Registration Statement was amended by a filing on July 8, 2020, which stated the IPO would consist of 39.5 million shares at an initial offering price of $19.00 per share. Then, on July 14, 2020, the Company increased the size of the Offering. On July 14, 2020, the Company priced the IPO at $21.00 per share and filed the final prospectus for the IPO on Form 424B4 (the "Prospectus" and, together with the

Registration Statement, the "Offering Documents"), which forms part of the Registration Statement. There was substantial investor demand for the Company's IPO due to the Company's staggering revenue growth and best-in-class LTV/CAC and by July 17, 2020, the Company completed the IPO, selling 43.5 million shares at $21.00 per share, generating over $913,500,000 in gross proceeds.

14.    The Offering Documents touted the Company's revenue growth, industry leading financial metrics, and strong relationships with carriers. However, despite the fact that certain of the Individual Defendants have since admitted that, at the time of the IPO, the Company had planned 2020 as an "investment year," the Offering Documents mentioned nothing about an "investment year." Further, the Individual Defendants have since explained, although they have failed to specifically correct the misleading statements and omissions in the Offering Documents, that because GoHealth had maximized its growth under its existing model the Individual Defendants had begun to change the Company's business model at the time of the IPO to maintain growth that investors had become accustomed to by, *inter alia*, adding new, large insurance carriers who paid reduced commission fees and did not sponsor the Company's marketing efforts. The Individual Defendants have also conceded that, due to the foregoing, they expected negative impacts on the Company's short-term financial performance for the year 2020 and did not anticipate seeing the benefit of the Company's investments until 2021 at the earliest.

15.    On August 19, 2020, the truth started to emerge when, during an earnings call, the Company revealed that it had added several new carriers as partners and was continuing to add more. The Company also disclosed that in connection to the addition of new carriers, there was "an initial ramp up period for new carriers with forecasted lower LTVs" and that GoHealth's "strategy to add several new, large carriers" was yielding "lower initial commission rates and

LTVs." GoHealth's "strategic decision" also involved an amplified concentration on selling Medicare "Special Needs Plans" ("SNPs"). However, the Company's focus on SNPs, investors learned, resulted in "other" revenue that was non-commissionable and thus created a "near-term drag on [the Company's] average LTV." Further, this caused elevated disenrollment rates or churn.

16.     On November 11, 2020, the Company reported its third quarter financial results for the period ending September 30, 2020. Investors then learned that the Company reported a loss per share of $0.65, which was $0.64 worse than analyst estimates. Further, the Company disclosed that it deepened GoHealth's reliance on "other" noncommissionable revenue which caused increased "near-term drag" on GoHealth's average LTV.

17.     Less than a month later, during a presentation at the Evercore ISI HealthCONx Conference on December 2, 2020, investors learned that the Company's had expected materially decreased commissions from newly added carriers and "LTV compression." Further, investors learned that the Company had not anticipated to see the "upside" of its investments until 2021.

18.     On December 2, 2020, the price per share of the Company's Class A common stock plummeted to an intra-day low of $10.01, over 52.3% lower than the price at the time of the IPO. This precipitous decline in the price per share of the Company's Class A common stock occurred in under five months, while the market was rising. Specifically, during the same time, the S&P 500 grew approximately 14%.

19.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

20.     In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

21.     Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to GoHealth, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's recent revenue growth and enhanced LTV/CAC metrics highlighted in the Offering Documents were the product of an unmaintainable business approach, i.e., significantly increased focus on only two Medicare insurance carriers; (2) the Company had gotten the most it could have out of the growth to be gained by focusing its business with only Humana and Anthem and, therefore, had to substantially modify GoHealth's business model to maintain a similar level of growth; (3) the Company and the Individual Defendants had designed 2020 to be an "investment year" for GoHealth, which involved substantial and fast carrier expansion in GoHealth's Medicare business along with a heightened dependance on non-commissionable SNPs, both of which would have adverse effects on the Company's key LTV metric; (4) the altered business model and the Company's carrier expansion had caused the Company to command smaller commission rates until it could secure the highest permissible commission rates that GoHealth benefited from with Humana and Anthem, adversely affecting the Company's LTV and causing a "near-term drag" on the Company's average LTV; (5) the altered business model and the Company's carrier expansion had caused the Company to command less marketing assistance from new carriers than it could with Humana and Anthem who sponsored the Company's marketing efforts, adversely affecting the Company's LTV/CAC; (6) the Company's supposed capability to "rapidly scale" was materially false since GoHealth encountered adverse financial dynamics as a result, including lower commission rates and less marketing support with new carriers; (7) to enroll a significant amount of new consumers with GoHealth's new insurance

carrier customers, the Company had to incur considerable expenditures such as advertising, marketing, and employee-related costs, which were greater than normal, in consideration for lower commissions, putting pressure on the Company's key LTV/CAC metric and sizeable cash outlays by GoHealth during 2020; (8) as the Company expanded its large Medicare carriers in 2020, the Company did not have sufficient information to form precise LTV expectations for its new business; (9) the Company's cash outlays due to the new Medicare carriers that GoHealth had previously added and also intended to add later in 2020 would negatively impact LTV/CAC since the Company had to incur significant upfront costs to build up its advertising and marketing and hire more employees to produce a sufficient amount of approved submissions at the new insurance carriers to validate its capacity to earn maximum commissions going forward; (10) the Company faced larger churn and reduced persistency, as well as added expenses in connection to its attempt to thwart rising churn and back persistency, as a result of selling SNPs and new plans for new Medicare carriers since there was a greater chance that customers that were slotted into new plans by inexperienced employees would make a switch in the insurance market, causing lower commissions, diminished profitability, and a "drag" on the Company's LTV/CAC; and (11) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

22.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

23.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO") and Co-Chair of the Board, its Chief

Strategy Officer ("CSO"), Special Advisor to the Executive Team, and Co-Chair of the Board, and its Chief Financial Officer ("CFO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

24.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

25.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

27.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action.

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Illinois or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

31.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

32.     Plaintiff is a current shareholder of GoHealth. Plaintiff has continuously held GoHealth common stock at all relevant times.

**Nominal Defendant GoHealth**

33.     GoHealth is a Delaware corporation with its principal executive offices at 214 West Huron Street, Chicago, Illinois 60654. GoHealth's shares trade on The NASDAQ Global Market ("NASDAQ") under the ticker symbol "GOCO."

**Defendant Jones**

34.     Defendant Jones is the co-founder of GoHealth and has served as the Company's CEO since founding in 2001 and as a Company director since 2020. He also serves as a member of the Nominating and Corporate Governance Committee. According to the Company's Schedule 14A filed with the SEC on April 6, 2021 (the "2021 Proxy Statement"), as of March 31, 2021, Defendant Jones beneficially owned 95,011,635 shares of the Company's Class A common stock

and 95,011,635 shares of the Company's Class B common stock, which represented 30.2% of the Company's combined voting power as of that date making him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $11.69, Jones owned approximately $2.2 billion worth of GoHealth stock.

35. For the fiscal year ended December 31, 2020, Defendant Jones received $31,664,706 in compensation from the Company. This included $325,000 in salary, $30,350,749 in stock awards, $231,000 in non-equity incentive plan compensation, and $757,957 in all other compensation.

36. The Company's 2021 Proxy Statement stated the following about Defendant Jones:

Clinton P. Jones is the co-founder of GoHealth and has served as GoHealth's Chief Executive Officer since GoHealth's founding in 2001. He has also been a member of GoHealth, Inc.'s Board of Directors since 2020 and a member of GoHealth Holdings, LLC's board of managers since 2019, as well as serving on the board of managers of GoHealth's predecessor since its founding in 2001. He also serves as member of the board of directors of Bridge Legal. From June 2000 to January 2001, Mr. Jones served as Intranet Market Manager for Holt Value, a former division of Credit Suisse. Mr. Jones speaks regularly at industry events and conferences. He is also active in insurance regulatory forums. In 2013, Mr. Jones was recognized by Ernst & Young as the Midwest Entrepreneur of the Year and was also named to the annual Chicago leadership list, Crain's 40 under 40. Mr. Jones holds Bachelor of Science degrees in both Marketing and Management Information Systems from Miami University. We believe Mr. Jones is qualified to serve on GoHealth, Inc.'s Board of Directors due to his extensive experience in the insurance industry and his knowledge of our business in particular, gained through his services as our co-founder and Chief Executive Officer.

**Defendant Matthiesen**

37. Defendant Matthiesen has served as the Company's CFO since 2018. Previously, he served as the Company's Vice President of Finance and Marketplace Operations from 2017 until 2018 and as the Company's Corporate Controller from 2010 until 2017.

38. The Company's 2021 Proxy Statement stated the following about Defendant Matthiesen:

Travis J. Matthiesen has served as GoHealth's Chief Financial Officer since 2018. Prior to serving as Chief Financial Officer, he served as GoHealth's Vice President of Finance and Marketplace Operations from 2017 to 2018 and as GoHealth's Corporate Controller from 2010 to 2017. He also served as a member of the board of directors of Creatix, Inc., our subsidiary, from 2018 to 2019. From 2006 to 2010, Mr. Matthiesen worked at the Assurance and Advisory Services Department of Ernst & Young LLP. Mr. Matthiesen holds a Master of Business Administration from the University of Notre Dame and a Bachelor of Science degree in Accounting from Cedarville University.

**Defendant Cruz**

39.     Defendant Cruz is the co-founder of GoHealth and has served as the Company's CSO and Special Advisor to the Executive Team since 2010 and as a Company director since 2020. He also serves as the Chairperson of the Compensation Committee. Previously, Defendant Cruz served as the Company's President from 2001 until 2020. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Cruz beneficially owned 95,011,635 shares of the Company's Class A common stock and 95,011,635 shares of the Company's Class B common stock, which represented 30.2% of the Company's combined voting power as of that date making him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $11.69, Cruz owned approximately $2.2 billion worth of GoHealth stock.

40.     For the fiscal year ended December 31, 2020, Defendant Cruz received $32,101,235 in compensation from the Company. This included $325,000 in salary, $30,350,749 in stock awards, $231,000 in non-equity incentive plan compensation, and $1,194,486 in all other compensation.

41.     The Company's 2021 Proxy Statement stated the following about Defendant Cruz:

Brandon M. Cruz is the co-founder of GoHealth and has served as GoHealth's Chief Strategy Officer and Special Advisor to the Executive Team since 2020. Prior to this role, he served as President of GoHealth since its founding in 2001. He has also been a member of GoHealth, Inc.'s board of directors since 2020 and a member

of GoHealth Holdings, LLC's board of managers since 2019, as well as serving on the board of managers of GoHealth's predecessor since its founding. He serves on the board of Homecare Holdings. Mr. Cruz holds a Bachelor of Science degree in Management Information Systems from Miami University, and is a member of the Miami University Business Advisory Council. We believe Mr. Cruz is qualified to serve on GoHealth, Inc.'s board of directors due to his extensive experience in the insurance industry and his knowledge of our business in particular, gained through his services as our co-founder and Chief Strategy Officer and Special Advisor to the Executive Team.

**Defendant Flanagan**

42. Defendant Flanagan has served as a Company director since 2020. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Flanagan beneficially owned 33,758 shares of the Company's Class A common stock and 24,830 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $11.69, Flanagan owned approximately $684,894 worth of GoHealth stock.

43. For the fiscal year ended December 31, 2020, Defendant Flanagan received $617,812 in compensation from the Company. This included $75,815 in salary, $250,005 in stock awards, and $291,992 in inventive unit awards.

44. The Company's 2021 Proxy Statement stated the following about Defendant Flanagan:

> Joseph G. Flanagan has served as a member of GoHealth, Inc.'s board of directors since 2020 and as a member of GoHealth Holdings, LLC's board of managers since 2020. Mr. Flanagan has also served as the President and Chief Executive Officer and as a member of the board of directors of R1 RCM Inc. ("R1"), a healthcare revenue cycle management company, since May 2016, after having served as R1's Chief Operating Officer since April 2013 and President and Chief Operating Officer since April 2016. Mr. Flanagan holds a Bachelor of Science degree in Engineering from the United States Merchant Marine Academy. We believe Mr. Flanagan is qualified to serve on GoHealth, Inc.'s board of directors due to his knowledge of the healthcare industry and extensive board experience.

**Defendant Gayle**

45. Defendant Gayle has served as a Company director since 2020. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Gayle beneficially owned 5,358 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $11.69, Gayle owned approximately $62,635 worth of GoHealth stock.

46. For the fiscal year ended December 31, 2020, Defendant Gayle received $222,557 in compensation from the Company. This included $72,554 in salary and $150,003 in stock awards.

47. The Company's 2021 Proxy Statement stated the following about Defendant Gayle:

Helene D. Gayle has served as a member of GoHealth, Inc.'s board of directors since 2020. Dr. Gayle has been the Chief Executive Officer of The Chicago Community Trust since 2017 and previously served as the Chief Executive Officer at the McKinsey Social Initiative, a nonprofit organization launched by McKinsey & Company that implements programs that bring together varied stakeholders to address complex global social challenges from 2015 to 2017. From 2006 to 2015, Dr. Gayle served as President and Chief Executive Officer of CARE USA, a leading international humanitarian organization. For twenty years, from 1984 to 2004, Dr. Gayle worked for the Centers for Disease Control, retiring as a Rear Admiral in the Public Health Service and an Assistant Surgeon General. Dr. Gayle serves as a member of the board of directors of The Coca-Cola Company and Colgate-Palmolive Company. Dr. Gayle holds a Bachelor of Arts in Psychology from Barnard College of Columbia University, a Doctor of Medicine degree from the University of Pennsylvania and a Master of Public Health degree from Johns Hopkins University. We believe Dr. Gayle is qualified to serve on GoHealth, Inc.'s board of directors due to her extensive knowledge of the healthcare industry, extensive board experience and many years of leadership experience.

**Defendant Gelber**

48.     Defendant Gelber has served as a Company director since 2020. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

49.     The Company's 2021 Proxy Statement stated the following about Defendant Gelber:

> Jeremy W. Gelber has served as a member of GoHealth, Inc.'s Board of Directors since 2020 and as a member of GoHealth Holdings, LLC's board of managers since 2019. Mr. Gelber has been a Senior Managing Director of Centerbridge since 2018, where he focuses on investments in the healthcare sector, and has also served as a member of the board of directors of American Renal Associates Holdings, Inc. since 2020, Civitas Solutions, Inc. since 2019 and Remedi SeniorCare Holding Corporation since 2019. Prior to joining Centerbridge, Mr. Gelber was a Partner at Pamplona Capital, a private equity firm, and also served as Executive Director in the Healthcare Investment Banking Division at Morgan Stanley. Mr. Gelber holds a Bachelor of Science degree from Dartmouth College and a Doctor of Medicine degree from Jefferson Medical College. We believe Mr. Gelber is qualified to serve on GoHealth, Inc.'s Board of Directors due to his knowledge of the healthcare industry, broad financial expertise and many years of leadership experience.

**Defendant Pramoda**

50.     Defendant Pramoda has served as a Company director since 2020. She also serves as the Chairperson of the Audit Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Pramoda beneficially owned 8,928 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $11.69, Pramoda owned approximately $104,368 worth of GoHealth stock.

51.     For the fiscal year ended December 31, 2020, Defendant Pramoda received $322,559 in compensation from the Company. This included $72,554 in salary and $250,005 in stock awards.

52.     The Company's 2021 Proxy Statement stated the following about Defendant Pramoda:

Anita V. Pramoda has served as a member of GoHealth, Inc.'s Board of Directors since 2020. Ms. Pramoda also serves as a member of the board of directors of the Federal Reserve Bank of San Francisco (Los Angeles) and Health Catalyst, Inc., a provider of data and analytics technology and services to healthcare organizations. Ms. Pramoda is a Venture Partner and Executive Advisor at the Technology Crossover Ventures. Previously, Ms. Pramoda served as a member of the board of directors of Dignity Health Foundation, from 2013 to 2017, Allscripts Healthcare, LLC, from 2013 to 2016 and as Chief Financial Officer at Epic Systems Corporation, from 2009 to 2012. Ms. Pramoda holds a Master in Business Administration degree from the University of Pennsylvania - The Wharton School. We believe Ms. Pramoda is qualified to serve on GoHealth, Inc.'s Board of Directors due to her extensive knowledge of the healthcare industry, extensive board experience and many years of leadership experience.

**Defendant Tawil**

53.     Defendant Tawil has served as a Company director since 2020.

54.     The Company's 2021 Proxy Statement stated the following about Defendant Tawil:

Miriam A. Tawil has served as a member of GoHealth, Inc.'s board of directors since 2020. Ms. Tawil has been a Managing Director of Centerbridge since 2012, where she focuses on investments in the healthcare and financial services sectors. Ms. Tawil also serves as a member of the board of directors of Civitas Solutions, Inc. Prior to joining Centerbridge, Ms. Tawil was an associate at TPG Capital from 2008 to 2010 and an analyst in the Mergers and Acquisitions Group of The Blackstone Group L.P. from 2006 to 2008. Ms. Tawil holds a Bachelor of Arts from Harvard College and a Master in Business Administration degree from Harvard Business School. We believe Ms. Tawil is qualified to serve on GoHealth, Inc.'s board of directors due to her extensive knowledge of the healthcare industry, broad financial expertise and years of leadership experience.

**Defendant Timm**

55.     Defendant Timm has served as a Company director since 2020. He also serves as a member of the Audit Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Timm beneficially owned 30,188 shares of the Company's Class A common stock and 24,830 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $11.69, Timm owned approximately $643,160 worth of GoHealth stock.

56.     For the fiscal year ended December 31, 2020, Defendant Timm received $516,180 in compensation from the Company. This included $74,185 in salary, $150,003 in stock awards, and $291,992 in incentive unit awards.

57.     The Company's 2021 Proxy Statement stated the following about Defendant Timm:

Alexander E. Timm has served as a member of GoHealth, Inc.'s board of directors since 2020 and as a member of GoHealth Holdings, LLC's board of managers since 2020. Mr. Timm is also the Chief Executive Officer of Root Insurance Company, which he co-founded in 2015. Additionally, from 2011 to 2015, Mr. Timm worked at Nationwide Insurance as a senior consultant in corporate strategy. Mr. Timm holds a Bachelor of Science degree in Business Administration and a Bachelor of Arts degree in Actuarial Studies, Accounting and Mathematics from Drake University. We believe Mr. Timm is qualified to serve on GoHealth, Inc.'s board of directors due to his extensive insurance industry experience, as well as his success in the entrepreneurial, technology, and data science industries.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.     By reason of their positions as officers, directors, controlling shareholder, and/or fiduciaries of GoHealth and because of their ability to control the business and corporate affairs of GoHealth, the Individual Defendants owed GoHealth and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GoHealth in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GoHealth and its shareholders so as to benefit all shareholders equally.

59.     Each controlling shareholder, director, and officer of the Company owes to GoHealth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60. The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholders of GoHealth, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

61. To discharge their duties, the officers, directors, and controlling shareholders of GoHealth were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62. Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controlling shareholders of GoHealth, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised GoHealth's Board at all relevant times.

63. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

64.     To discharge their duties, the officers and directors of GoHealth were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of GoHealth were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to GoHealth's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how GoHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of GoHealth and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GoHealth's operations would comply with all applicable laws and GoHealth's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.     Each of the Individual Defendants further owed to GoHealth and the shareholders the duty of loyalty requiring that each favor GoHealth's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.     At all times relevant hereto, the Individual Defendants were the agents of each other and of GoHealth and were at all times acting within the course and scope of such agency.

67.     Because of their advisory, executive, managerial, and directorial positions with GoHealth, each of the Individual Defendants had access to adverse, non-public information about the Company.

68. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GoHealth.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

70. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

71. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of GoHealth was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

72. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

73.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GoHealth, and was at all times acting within the course and scope of such agency.

## GOHEALTH'S CODE OF CONDUCT

74.     The Company's Code of Conduct, "applies to all of our directors, officers and other employees," and contains guidance for conducting the Company's business in a manner that is "consistent with the highest standards of business ethics."

75.     The Code of Conduct provides, regarding "Reporting Violations of the Code," in relevant part, that:

> All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, immediately report the conduct to your supervisor as well as the General Counsel and/or Chief Legal Officer.

76.     In relevant part, the Code of Conduct provides, in a section titled "Conflicts of Interest," that:

> Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

77.     The Code of Conduct provides, in a section titled "Competition and Fair Dealing," that:

> All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors.

Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

78.　　The Code of Conduct provides, as to "Company Records," that:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor, the General Counsel or the Chief Legal Officer to obtain a copy of any such policy or with any questions concerning any such policy.

79.　　In a section titled, "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides, the following:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

80.　　In a section titled, "Compliance with Laws and Regulations," the Code of Conduct provides, the following:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or an attorney in the legal department.

81. In a section titled, "Public Communications and Regulation FD," the Code of

Conduct provides, the following, in relevant part:

A. Public Communications Generally

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

B. Compliance with Regulation FD

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company should not communicate any information about the

Company to analysts, institutional investors or representatives of the media, except at the request of the Company's designated spokespersons.

82.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.     The Company, which was co-founded in 2001 by Defendants Cruz and Jones, operates an end-to-end health insurance marketplace that focusses on pairing consumers with health insurance plans.

84.     The Company is currently organized as a Delaware holding company, with GoHealth Holdings as its main asset. However, GoHealth Holdings, is also a holding company. Blizzard Midco, LLC ("Blizzard") is a wholly owned subsidiary of GoHealth Holdings and Norvax, LLC, where the Company's operations are carried out, is a wholly owned subsidiary of Blizzard. Until September 2019, when Centerbridge acquired 100% of Norvax, GoHealth Holdings was formerly known as Blizzard Parent, LLC.

85.     The Company characterizes itself as a "leading health insurance marketplace" which utilizes a "proprietary technology platform," together with machine-learning algorithms, to help people locate appropriate carrier plans for health insurance. In order to support its platform,

GoHealth also employs licensed insurance agents to assist in enrolling consumers in plans with health insurance carriers.

86.     GoHealth purports to be a rapidly growing business and it separates itself from traditional face-to-face methods of selling insurance with its technological platform. GoHealth asserts that because its technology enables the Company to have real time access to data in addition to licensed agents, GoHealth operates more efficiently than the insurance marketplace, which is extremely competitive. In fact, Defendant Jones has declared that the Company does not "see surprises" due to the Company's technological operations and the "data and insights" available to the Company.

87.     For years leading up to the IPO, the Company's business became increasingly centered around Medicare products (particularly, Medicare Advantage plans).

88.     Like an insurance broker, the Company mainly generates revenue based on commissions from health insurance carriers. Therefore, consumers do not pay any fees for access to the Company's platform or for its help enrolling them in the plans. Typically, GoHealth receives an initial commission upon an individual enrolling in a plan. Moreover, the Company earns additional and periodic commissions if those individuals maintain their health insurance plans. This fee structure creates an opportunity for the Company to partner with specific insurance carriers to assist them in selling their policies. To accomplish this, GoHealth uses "advanced statistical models" which are developed based on "observable commissions," to examine consumer data and project GoHealth's prospective commission streams. This information is helpful in determining the Company's LTV.

89.     The Company has four operating segments: (1) Medicare-Internal; (2) Medicare-External; (3) IFP and Other-Internal; and (4) IFP and Other-External. "Internal" refers to

commission revenues produced through Company-employed agents, whereas "External" refers to commission revenues produced through agents that make up an independent, national network that utilize the Company's technological platform. The Medicare-Internal and Medicare-External segments focus on sales of Medicare Advantage, Medicare Supplement, Medicare prescription drug plans, and Medicare SNPs for carriers.

90. The Company's Medicare-Internal and Medicare-External segments produce the majority of its revenue. For example, in the quarter ended March 31, 2020, GoHealth's Medicare segments produced 89% of GoHealth's revenues. Specifically, the Company's Medicare-Internal segment and the Company's Medicare-External segment generated 68% and 21% of the Company's total revenues, respectively. Specifically, within the Company's critical Medicare segments, Medicare Advantage products produce the bulk of the Company's net revenues. In particular, within the Medicare-Internal segment and the Medicare-External segment Medicare Advantage products account for 75% and 95% of net revenues, respectively during the first fiscal quarter of 2020.

91. According to GoHealth, lifetime value of commissions per consumer acquisition cost ("LTV/CAC") is the most critically important financial metric for determining the Company's overall business profitability and efficiency, and the performance of its integrated platform. LTV is the commission revenues the Company anticipates receiving from carriers for approved submissions of consumer insurance policies in the long run. LTV is calculated using a number of variables that the Company does not publicly report including contracted commission rates, carrier mix, policy persistency, and the number of expected submissions. CAC is the cost that the Company incurs while securing its consumers. Therefore, LTV/CAC is a metric that measures the return the Company anticipates on its investment in consumer acquisitions.

92.     GoHealth recognizes revenue when a "[s]ubmitted [p]olicy" is approved, i.e., it becomes an "[a]pproved [p]olicy" by "applying the latest estimated LTV for that product." The Company forecasts commission revenue for the carrier products that it markets and sells by using a "portfolio approach" to a group of approved customers that are organized based on a number of characteristics that the Company refers to as "cohorts." The Company projects the commission it anticipates it shall collect for each "approved customer cohort" by evaluating a number of factors such as "commission rates, carriers, estimated average plan duration, the regulatory environment, and historic cancellations of health insurance plans offered by carriers with which [the Company has] a relationship." The Company then recomputes LTV on a quarterly basis "at a cohort level for all outstanding cohorts" as it analyses fluctuations in the statistics used to forecast LTV and the money secured for each cohort as balanced with the Company's initial projections. Since there are so many variables and suppositions fundamental to the Company's LTV calculations, investors and analysts have no way to substantiate or wholly comprehend how the Company determines LTV. However, LTV fluctuations certainly impact revenue and GoHealth's commissions receivables. Moreover, negative adjustments in the factors upon which the Company relies on to project LTV, including reduced commission rates and increased churn or decreased persistency, certainly have an adverse impact on the Company's financial earnings.

93.     According to the Company, its Medicare-Internal and Medicare-External segments power the highest LTV/CAC among the insurance carrier plans GoHealth offers, including in the years leading up to IPO. Regarding the Medicare-Internal and Medicare-External segments, GoHealth highlighted its model using agents to assist consumers as maximizing LTV/CAC and recognized the Company's capacity to rapidly scale and expand relationships with insurance carriers as vital to the progress of the segments and also the key metric, LTV/CAC.

94.     Uniquely, the Company produced a significant majority of its revenues from just two carriers: Humana and Anthem. For example, in 2019, Humana made up 40% and Anthem made up 20% of GoHealth's total revenues. Additionally, in the fiscal period ended March 31, 2020, Humana and Anthem combined generated 74% of the Company's total revenues which was an increase from the 43% of GoHealth's total revenues in the fiscal period ended March 31, 2019. Moreover, Humana and Anthem accounted for approximately 85% of the revenues in GoHealth's Medicare-Internal and Medicare-External segments for the period ended March 31, 2020.

95.     The Company's deepened focus on Humana and Anthem in the time preceding the IPO was paralleled by rapid revenue growth and best-in-class LTV/CAC. For instance, the Company maintained that GoHealth's revenues increased 138.5% from 2018 to 2019 to $539.5 million and increased 104.1%, to $141.0 million, during the fiscal quarter ended March 31, 2020 compared with the fiscal quarter ended March 31, 2019. Also, GoHealth had supposedly enhanced Company's LTV/CAC to 3.9x during fiscal 2019 (which was up from 2.7x in fiscal 2018) and to 2.7x during the fiscal quarter ended March 31, 2020 (which was up from 1.7x for the fiscal quarter ended March 31, 2019) in connection to the Company's important Medicare-Internal segment.

96.     To enroll consumers on the Company's technological platform, GoHealth incurs substantial out-of-pocket costs, such as marketing and advertising expenses and customer care and enrollment expenses, to produce qualified prospects, inform and register those consumers in health insurance carriers' plans, and present finished applications to those carriers. Since the commission earned from that process is typically remunerated to the Company over time, with the initial fees being paid to GoHealth generally more than a few weeks or even months after the Company submits finished requests to its partner-insurance carriers, GoHealth needs substantial cash to sponsor the Company's operations.

97.     Before the IPO, the Company profited from lower costs associated with acquiring customers through deeply focusing GoHealth's vital Medicare business with only two carriers, Humana and Anthem, since those carriers heavily funded the Company's marketing costs, paid the Company maximum commission rates, and were also greatly integrated with the Company's platform. As a result, the Company enjoyed markedly reduced direct marketing expenses for each insurance policy compared with the Company's competitors. Moreover, it led to the Company producing best-in-class LTV/CAC. However, if the Company were to, over a short period of time, significantly grow the number of carriers in its Medicare business, the Company encountered reduced commission rates, a material drop in support of its marketing efforts, diminished technical integration, and added costs in connection to training agents to inform them about the plans of the new carrier, which served to diminish the Company's critically important and highly publicized metric, LTV/CAC. Additionally, not only did selling new plans for new customers at lower commission rates indeed caused a dip in the Company's profitability, but it also reduced the rate of persistency and amplified the rate of churn, and/or boosted the Company's expenses it was forced to lay out to thwart those negative trends, while consumers who were registered for new plan offerings by inexperienced insurance agents in the Medicare market were increasingly expected to make a switch. This also caused a significant adverse impact on the Company's LTV/CAC.

98.     Despite the foregoing, GoHealth touted the Company's great LTV/CAC ratio, which the Company attained in a competitive market, as the main outcome of GoHealth's supposedly singular competitive strength in the services it offered to the Company's carriers.

**Centerbridge Acquires a Controlling Interest in the Company Prior to the IPO and the Company Realizes Precipitous Growth**

99. Centerbridge is a multi-strategy private investment firm focused on leveraged buyouts and distressed securities which manages more than $25 billion of assets. Centerbridge was the main beneficiary and private equity sponsor of the Company's IPO

100. On September 13, 2019, Centerbridge indirectly acquired, through a newly formed entity (GoHealth Holdings), 100% of the equity in Norvax—the operating entity of the Company's business. Centerbridge acquired Norvax's equity in consideration for $807 million in cash and $306 million in equity (the "Acquisition"). Centerbridge also agreed to pay Norvax's selling shareholders up to $275 million of additional consideration in the form of earnouts contingent upon GoHealth achieving certain earnings targets towards the end of fiscal 2019 and during fiscal 2020 ("Earnout Terms"). Thus, the Earnout Terms built a clear motivation for certain of the Individual Defendants to produce rapid growth after the Acquisition.

101. The Offering Documents stated that the Company achieved remarkable growth following the Acquisition and leading up to GoHealth's IPO. Between September 13, 2019 and December 31, 2019, the Company produced $308 million in net revenues while the Company only generated $231 million in net revenues from January 1, 2019 to September 12, 2019. Consequently, the Company produced significantly higher (33%) revenues in the time short time after the Acquisition compared with the nearly 9 month period prior to the Acquisition. Additionally, the Company generated 36% more revenues in the post-Acquisition period at the end of 2019 than it did in the full fiscal year of 2018 (during which time the Company only generated approximately $226 million in net revenues).

102. In accordance with the Earnout Terms of the Acquisition, due to GoHealth's extraordinary growth in total net revenues during the period after the Acquisition, GoHealth sustained $75 million in contingent consideration liability between the Acquisition and March 31,

2020. These expenses were paid out to Norvax's selling shareholders in the Acquisition including to Defendant Cruz.

**GoHealth's IPO**

103.    In May 2020, the Individual Defendants began implementing steps to take the Company public. On May 8, 2020, the Company filed a draft registration statement on Form DRS with the SEC. More than one month later, on June 19, 2020, the Company filed the Registration Statement seeking to register Class A shares of the Company's common stock. On July 6, 2020, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC which included an amended and restated certificate of incorporation and bylaws to go into effect after various transactions after the IPO and an indemnification agreement between the Company and GoHealth's officers and directors. A second amendment was filed with the SEC on July 8, 2020. The amendment stated that 39,500,000 shares of Class A common stock would be registered in the IPO with an estimated IPO price per share between $18.00 and $20.00. The Registration Statement was declared effective on July 14, 2020. Also on July 14, 2020, the Company filed an additional Registration Statement on Form S-1MEF which incorporated the prior Registration Statements by reference, and registered an additional 4,600,000 shares of Class A common stock to be sold in the IPO, which included 600,000 shares to be sold pursuant to the option of the underwriters to purchase additional shares. The Registration Statement priced the IPO at $21.00 per share of Class A common stock.

104.    The Company's stock began trading publicly on the NASDAQ the next day, on July 15, 2020. Subsequently, on July 16, 2020, the Company filed the Prospectus on Form 424B4 which stated that 43,500,000 shares of Class A common stock would be registered in the IPO, at a $21.00 per share. Through the IPO, which closed the next day, July 17, 2020, approximately 43.5 million shares of stock were sold at $21.00 per share, including additional shares sold through options exercised by the underwriters to the IPO. As a result of the IPO, GoHealth received

aggregate net proceeds of approximately $913.5 million, in gross proceeds and approximately $852.4 million in net proceeds, after deducting the underwriting discounts and offering expenses.

**The Company Prepared to Shift GoHealth's Business Model at the Time of the IPO and Expected the Shift to Adversely Affect LTV and Customer Churn**

105.    Leading up to the IPO, more and more the Company had shifted its business model to concentrate on Medicare Advantage plans and deemphasize the IFP part of the Company's business. GoHealth's Medicare-Internal segment was the biggest segment in terms of revenue and the main contributor to GoHealth's earnings. In particular, the Medicare segments were responsible for 88.1% of GoHealth's total revenues in the fiscal period ended March 31, 2020, up from 59.7% of total revenues during the period ended March 31, 2019. Further, the Medicare segments represented 98% of total profit during the period ended March 31, 2020, up from 47% of total profit during the period ended March 31, 2019.

106.    Unbeknownst to investors, the Company's supposedly spectacular growth and enriched success during the time preceding the IPO were based on deepening GoHealth's reliance on only two insurance carriers: Human and Anthem. However, at the time of the IPO, the Company had fully exploited its growth potential using that two-carrier business model and, was forced to significantly and quickly alter the Company's business model to add more insurance carriers to continue growing.

107.    Consequently, the Individual Defendants deliberately intended for 2020 to be an "investment year" for GoHealth. This new course came with major disruptions to the GoHealth's key metric, LTV/CAC, since the Company meaningfully inflated its Medicare business to create relationships with more insurance carriers. Although prior to the IPO, the Company had enjoyed great technical integration and carrier-sponsored marketing, which led to rapid growth and best in class LTV/CAC numbers, the post-IPO change in strategy would threaten those competitive advantages.

108. Therefore, additional expansion of the Company's Medicare Advantage insurance carrier base came at a significant cost which the Offering Documents did not reveal. As the Individual Defendants intended to, and did, meaningfully enlarge the Company's Medicare business to include more large Medicare insurance carriers in fiscal 2020, while also intensifying GoHealth's dependance on SNPs, GoHealth encountered substantial short-term pressures on its financial performance that led the Individual Defendants to dub 2020 as an "investment year." The negative, short-term pressures the Company faced included:

a. Lower commission rates from new carriers until such time that the Company could earn top-tier commission rates with those carriers;

b. The Company did not have a sufficient amount of data or observed data to make precise LTV suppositions during its roll out to new Medicare insurance carriers;

c. The Company's cash outlays in connection to partnering with new carriers were significant, since the Company heavily marketed new carrier plans, hired additional sales agents, and drove conversions of consumers to Medicare Advantage plans, in part to earn increased commission rates. These costs were exacerbated by the fact that, with new carriers, the Company no longer received carrier-sponsored marketing like it had received with established carriers.

d. Decreased rate of persistency and increased rate of churn and/or increased costs to thwart those negative trends, while consumers who were registered for new plan offerings by inexperienced insurance agents in the Medicare market were increasingly expected to make a switch. This also caused a significant adverse impact on the Company's LTV/CAC.

e. To reduce this interruption, the Company amplified sales of SNPs during fiscal 2020, which lowered the percentage of commissionable revenue against non-commissionable revenue earned by GoHealth, had higher churn rates, and also created drag on the Company's LTV.

**The Individual Defendants' Duty to Disclose**

109.     SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to their finances and operations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(2)(ii) ("Item 303") required the Individual Defendants "[d]escribe any known trends or uncertainties that have had or that [the registrant] reasonably [expects will] have a material favorable or unfavorable impact on sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation SK, 17 C.F.R. §229.105 ("Item 105"), requires the "Risk Factors" section of the Offering Documents to provide "a discussion of the [most substantial] factors that make [the IPO] . . . speculative or risky" and requires each risk factor to "adequately describe[] the risk." Additionally, SEC Staff Accounting Bulletin No. 104 ("SAB 104") mandated the Company to disclose "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."

110.     The Individual Defendants caused the Offering Documents to fail to disclose their planned shift in the Company's business model and the negative corollaries the Individual Defendants expected and known risks resulting from the change in strategy, which had already been partially realized during the IPO. This failure violated Item 303 since the Individual Defendants knew of the undisclosed facts, trends, and uncertainties and knew that they would have (and were having) an adverse effect on GoHealth's financial performance. This failure also violated Item 105 since these specific and known risks were not properly disclosed despite constituting material factors that made the Company a speculative or risky investment. Moreover, the Offering Documents violated SAB 104 since the Individual Defendants failed to disclose the Company had also been changing GoHealth's business approach to increasingly rely on SNPs that

produced "other" revenue, which was non-commissionable and had short-term, negative effects on LTV.

111.     The SEC issued an interpretive release on Item 303 in May 1989 ("1989 Interpretive Release"), stating, in pertinent part:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

112.     The 1989 Interpretive Release established a test to determine whether disclosure under Item 303(a) is required. The 1989 Interpretive Release stated the following, in relevant part:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

113.     Further, effective December 29, 2003, the SEC published interpretive guidance, stating, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F." Specifically, the SEC guidance provided that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are

reasonably likely to have a material effect on financial condition or operating performance," quoting the 1989 Interpretive Release as support:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

114.    Also, within SAB 104, the SEC Staff offers particular guidance on required MD&A disclosures concerning a company's revenue and changes in a company's revenue: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease." The MD&A must "'give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.'" This includes an "increasing trend toward sales to a different class of customer, such as [one] that has a lower gross profit margin than existing sales that are principally made to [other types of customers]."

115.    Thus, the Individual Defendants had a duty to disclose information required by Items 303 and SAB 104 in the Offering Documents. However, the Offering Documents made materially false and misleading statements and omissions by failing to disclose known trends, events, and uncertainties at the time of the IPO. Specifically, the Offering Documents failed to disclose: (1) an ongoing, planned material addition of several new and large Medicare carriers; (2) that the foregoing put short-term negative pressure on GoHealth's key financial metric, LTV/CAC since the Company received reduced commissions and the Company's marketing efforts were not being subsidized by those new carriers, resulting in rising expenses; (3) moreover, the Company faced a reduced rate of persistency and higher rate of churn because the Company's sales workers were forced to learn how to sell new carrier plans; (4) that the Company's amplified dependance

on "other" revenue from SNPs, which was non-commissionable, created a drag on the Company's LTV and compounded churn; and (5) that fiscal 2020 was expected to be an "investment year" due to the Company's material change in its business strategy and that the Company was expected to face short-term negative financial impacts that would not produce benefits until at least 2021.

116. The Offering Documents also failed to issue adequate risk warnings regarding material risk the Company faced at the time of the IPO in violation of Item 303, Item 105, and SAB 104 which rendered an investment in the Company's IPO materially riskier than depicted in the Offering Documents.

**False and Misleading Statements**

*The Offering Documents*

117. On July 16, 2020, the day after the Company's stock began trading on the NASDAQ, the Company filed with the SEC the Prospectus in connection with the IPO. The Prospectus formed part of the Company's Registration Statement on Form S-1 filed on June 19, 2020, as amended, before the Company went public. The Registration Statement was signed by the Individual Defendants.

118. The Offering Documents touted that the GoHealth's expanded platform would "improve" the Company's "key drivers" of LTV/CAC, stating, in relevant part:

> We focus on strengthening the key drivers of LTV/CAC, including marketing costs, the consumer lead to customer conversion rate and customer satisfaction. While we offer both do-it-yourself and agent-assisted channels to accommodate consumers' preferences, we believe that for most qualified Medicare prospects, an agent-assisted model maximizes LTV/CAC. ***As we continue to scale our platform, we improve our key drivers through specialization and optimization using our proprietary data and machine-learning***.

(Emphasis added.)

119. Regarding the Company's Medicare-Internal segment, the Offering Documents stated, in relevant part, that "[g]oing forward, [the Company] intend[ed] to continue our focus on

growth and placing qualified prospects within this segment." The Offering Documents continued "carriers that partner with [GoHealth] through one or more of [GoHealth's] internal segment businesses will often supplement [GoHealth's] marketing and technology investments."

120. Regarding the GoHealth's "strengths," the Offering Documents touted the Company's "rapid scalability" and insinuated that the Company's association with "many carriers" would increase LTVs at reduced CACs and that the figures created via the sales process "deepen[ed]" the Company's "relationships with carriers." The Offering Documents stated the following:

> We use a combination of proprietary and third-party data, direct API connections to many carriers, and our proprietary technology platform, Marketplace, to educate, quote and enroll consumers in real-time to the health insurance plan best suited to meet their specific needs, which enhances long-term customer satisfaction. ***The resulting increase in the expected LTV of consumers obtained at a lower CAC has made our innovative distribution model more appealing to carriers and has altered their own approach to strategic marketing and consumer acquisition***. The data we generate from each consumer interaction helps inform our marketing, consumer lead scoring, qualified prospect routing, and health insurance plan matching technology in a feedback loop. ***We engineered our marketplace for rapid scalability***, with modern cloud infrastructure that has information security controls that are independently audited by several third-party firms and complies with HIPAA, TCPA and DOI and CMS regulations. We had over 132,000 Submitted Policies in the Medicare segments for the three months ended March 31, 2020 and over 427,000 Submitted Policies in the Medicare segments for the year ended December 31, 2019, which we believe makes us one of the largest health insurance marketplaces based on publicly available information about our competitors and our carriers and our general knowledge of the industry acquired over our 19-year operating history. ***The data generated through the sales process by these consumers helps us increase LTV/CAC through machine-learning enabled feedback loops, and allows us to improve and deepen our relationships with carriers***.

(Emphasis added.)

121. Concerning GoHealth's concentration on just two insurance carriers as clients in the Company's key Medicare Advantage business, the Offering Documents lauded GoHealth's "deep, tenured, and expanding" relationships with other carriers, stating, in relevant part that:

Our carrier relationships allow us to offer a wide variety of products and plans across our platform and offer solutions tailored to consumers' healthcare needs. We are a critical partner to our top carriers, for which we use our data and direct API connections to help inform their plan and network design and assist with budgeting. ***Our carrier relationships are stable, as evidenced by the fact that our relationships with each of our five largest carriers, measured by 2019 submission volume, exceeds five years***. Over the past five years, we have expanded those relationships from initially covering individual and family products to covering Medicare Advantage products at all five of these carriers. ***We are licensed in all 50 states and the District of Columbia, which combined with our data-driven, omni-channel marketing and effective and scalable marketplace, makes us a partner of choice for the leading Medicare Advantage plans nationally and in each state***.

122.    Although the Offering Documents mentioned that GoHealth intended to increase the geographic reach of its platform to comprise more Medicare Advantage products in 2020, it merely stated that it would cover "at least one of the top two carriers" and did not specify that GoHealth's recent, precipitous growth was built using an untenable strategy— i.e., growing its focus on only two carriers. Moreover, the Company did not reveal that GoHealth had been undergoing and preparing for substantial and fast Medicare Advantage carrier expansion, making 2020 an "investment year" for GoHealth with an anticipated "drag" on LTVs. Instead, the Offering Documents stated:

> ***We continue to focus on building out our carrier footprint in order to provide our consumers with a greater choice of health insurance plans. In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments.***

(Emphasis added.)

123.    Regarding GoHealth's strategy for growth, the Offering Documents stated that Medicare carriers had "shown increased interest in working with [GoHealth], including those who

had not traditionally used digitally-enabled models" and that the Company would "benefit from enhanced return of scale" and "more efficient marketing." The Offering Documents stated:

> We believe we are a partner of choice for the top carriers in the Medicare marketplace because of our scale, efficiency and ability to integrate with carriers using direct API connections to exchange data and insights. Given our growth in Approved Submissions in the Medicare segments and the integrated data and technology of our platform, Medicare carriers have shown increased interest in working with us, including those who have not *traditionally* used digitally-enabled models. ***In 2020, we expect our platform will include Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 49 states, which collectively represented 95% of 2019 Medicare enrollments. In 2019, our platform included Medicare Advantage products from at least one of the top two carriers, as measured by Medicare Advantage enrollees in each county, in 24 states, which collectively represented 54% of 2019 Medicare enrollments. This allows us to benefit from enhanced return of scale, more efficient marketing in these geographies, increased agent conversion rates of qualified prospects to customers, and improved customer satisfaction rates as we meet the needs of our customers***.

(Emphasis added.)

124.     The Offering Documents also stated that GoHealth could "rapidly scale" while "improving" the Company's key financial metric, its LTV/CAC ratio. Particularly, the Offering Documents stated the following:

> ***Our integrated technology platform, business processes, data and highly skilled and trained agents enable us to rapidly scale while improving our unit economics, as measured by LTV/CAC***. As we scale our business, our machine-learning data combined with our omni-channel marketing allows us to become progressively better at acquiring consumer leads with favorable engagement potential and to do so at lower cost. ***In doing so, we increase the lifetime commissions generated by the consumer leads we convert, which increases LTV per Approved Submission, and we reduce the cost of acquiring consumer leads, lowering CAC per commissionable Approved Submission***.

(Emphasis added.)

125.     Regarding GoHealth's capacity to appeal to other carriers and develop relationships with existing carriers, the Offering Documents stated the following, in relevant part:

> We generate revenue primarily from commissions earned through policy sales utilizing our platform. Carriers and other partners also pay us enrollment fees,

hourly fees and other fees for services performed for specific carriers. ***Attracting new carriers and expanding relationships with our existing carriers to offer more products and plans is critical to the growth of our business, particularly in the Medicare segments, which drive the highest LTV/CAC of the products and plans we offer. We are strategically adding carriers in the Medicare segments in order to offer top-rated plans and multiple plan choices in each of the U.S. counties in which we operate. This also allows us to market more efficiently in these geographies, increase conversion rates on consumer leads, and improve customer satisfaction rates as we are better able to meet consumers' specific needs, which drives revenue growth***.

(Emphasis added.)

126. The Offering Documents emphasized GoHealth's capability to sell SNPs throughout the special enrollment period, which would aid in "prioritiz[ing] agent growth year round." However, the Offering Documents did not reveal that the Company's growing usage of SNPs, which produced "other" revenue that was not commissionable, would likewise cause a short-term "drag" on the Company's average LTV while also causing churn to rise. For instance, the Offering Documents stated:

> In addition, ***we are increasingly adding SNPs into our marketplace from both existing and new carrier relationships***. Unlike Medicare Advantage products, which can largely be sold only during the Medicare annual enrollment period and open enrollment period, SNPs can generally be sold throughout the special enrollment period. ***As a result, we are able to maximize the value of our consumer interactions and marketing spend during the special enrollment period and prioritize agent growth year round. As we add more Medicare products and expand SNP offerings, we allocate more of our existing agent seat count to the Medicare—Internal segment from other less profitable channels, reducing the need to open new facilities***.
>
> * * *
>
> ***We were also able to utilize more agents on a year-round basis instead of during enrollment periods due to the addition of SNPs into our marketplace which are able to be sold at any time of year. Net revenues also increased in this segment due to the implementation of new marketing strategies to generate a greater number of qualified prospects and due to an increase in non-commission revenues***.

(Emphasis added.)

127.    In the risk warnings section, the Offering Documents did not reveal that the Company had already maximized its existing business model and therefore needed to quickly add new insurance carriers, make significant investments, and explore an unproven business approach in 2020. The Offering Documents also set forth vague, boilerplate discussions of hypothetical risks stating the following, in relevant part:

> Our commission rates from carriers are either set by each carrier or negotiated between us and each carrier. The commission rates we are paid are, for any given plan for a given customer, based on a number factors [sic], including the carriers offering those plans, the state of residence of customers, the laws and regulations in the jurisdictions where the customer is located, and the customer's previous Medicare enrollment history (if any). ***Carriers have the right to alter these commission rates with relatively short notice and have altered, and may in the future alter, the contractual relationships we have with them, including, in certain instances by unilateral amendment of our contracts relating to commission rates or otherwise***. For example, CMS could reduce the amount paid by CMS to Medicare Advantage plans or change the regulations and/or timelines applicable to the Medicare Advantage program, particularly in response to the COVID-19 pandemic, which could result in decreased commission rates or reduce carrier participation in the Medicare Advantage program. Changes of this nature could result in reduced commissions, or could impact our relationship with such carriers and potentially lead to contract termination. ***Because revenue in the Medicare segments is concentrated in a relatively small number of carriers, we are particularly vulnerable to changes in commission rates and changes in the competitiveness of our carriers' Medicare products***.

(Emphasis added.)

128.    Further, the risk warnings section of the Offering Documents stated, in pertinent part, that:

> ***Commission rates are also a factor in estimating our LTVs, which are impacted by a variety of factors, including the particular health insurance plans chosen by our customers, the carriers offering those plans, our customers' states of residence, the laws and regulations in those jurisdictions, the average premiums of plans purchased through us and healthcare reform. Any reduction in our average commission revenue per customer could harm our business, operating results and financial condition***.

(Emphasis added.)

129. The risk factors section of the Offering Documents continued, stating:

Our agreements with carriers to sell policies are typically terminable by our carriers without cause. ***Should we become dependent on fewer carrier relationships (whether as a result of the termination of carrier relationships, carrier consolidation or otherwise), we may become more vulnerable to adverse changes in our relationships with carriers, particularly in states where we distribute insurance from a relatively smaller number of carriers or where a small number of carriers dominate the market, and our business, operating results and financial condition could be harmed***.

(Emphasis added.)

130. The statements referenced in ¶¶ 117-129 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company's recent revenue growth and enhanced LTV/CAC metrics highlighted in the Offering Documents were the product of an unmaintainable business approach, i.e., significantly increased focus on only two Medicare insurance carriers; (2) the Company had gotten the most it could have out of the growth to be gained by focusing its business with only Humana and Anthem and, therefore, had to substantially modify GoHealth's business model to maintain a similar level of growth; (3) the Company and the Individual Defendants had designed 2020 to be an "investment year" for GoHealth, which involved substantial and fast carrier expansion in GoHealth's Medicare business along with a heightened dependance on non-commissionable SNPs, both of which would have adverse effects on the Company's key LTV metric; (4) the altered business model and the Company's carrier expansion had caused the Company to command smaller commission rates until it could secure the highest permissible commission rates that GoHealth benefited from with Humana and Anthem, adversely affecting the Company's LTV and causing a "near-term drag" on the Company's average LTV; (5) the altered business model and the Company's carrier expansion had caused the Company to command less marketing assistance from new carriers than it could

with Humana and Anthem who sponsored the Company's marketing efforts, adversely affecting the Company's LTV/CAC; (6) the Company's supposed capability to "rapidly scale" was materially false since GoHealth encountered adverse financial dynamics as a result, including lower commission rates and less marketing support with new carriers; (7) to enroll a significant amount of new consumers with GoHealth's new insurance carrier customers, the Company had to incur considerable expenditures such as advertising, marketing, and employee-related costs, which were greater than normal, in consideration for lower commissions, putting pressure on the Company's key LTV/CAC metric and sizeable cash outlays by GoHealth during 2020; (8) as the Company expanded its large Medicare carriers in 2020, the Company did not have sufficient information to form precise LTV expectations for its new business; (9) the Company's cash outlays due to the new Medicare carriers that GoHealth had previously added and also intended to add later in 2020 would negatively impact LTV/CAC since the Company had to incur significant upfront costs to build up its advertising and marketing and hire more employees to produce a sufficient amount of approved submissions at the new insurance carriers to validate its capacity to earn maximum commissions going forward; (10) the Company faced larger churn and reduced persistency, as well as added expenses in connection to its attempt to thwart rising churn and back persistency, as a result of selling SNPs and new plans for new Medicare carriers since there was a greater chance that customers that were slotted into new plans by inexperienced employees would make a switch in the insurance market, causing lower commissions, diminished profitability, and a "drag" on the Company's LTV/CAC; and (11) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge While the Individual Defendants Fail to Correct the False and Misleading Statements

46

131.    During an earnings call held by eHealth Inc. ("eHealth") (a large competitor of the Company) on July 23, 2020, eHealth's leadership stated that the Medicare brokerage industry had been facing increased churn for the first two quarters of 2020. Some of the issues that were mentioned had impacted the entire industry. During the call, eHealth's CEO stated that, "in the first half of this year, we saw increased levels of Medicare Advantage plan churn compared to our historic observations." He also stated, in relevant part:

> On the macro side, consumers are faced with broader plan choice and multiple enrollment opportunities throughout the year, which is benefiting the broader MA [Medicare Advantage] market and increasing the market share of MA plans. At the same time, ***these dynamics have also led to more shopping and more switching by MA members***.

(Emphasis added.)

132.    Only about one month after the IPO, on August 19, 2020 after the market closed, the Company reported its financial results for the fiscal period ended June 30, 2020. Although the Company reported revenue growth for the first three months and six months of 2020 and also noted "strong" Medicare Advantage enrollments, the Company also reported net loss of $22.9 million for the fiscal quarter ended June 30, 2020 representing a 250% drop in the period year-over-year, and a net loss of $23.8 million for the first six months of 2020, representing a 217% drop for the period year-over-year.

133.    GoHealth stated that it had added a few new insurance carriers, including national carriers such as UnitedHealth Group and Aetna, and "multiple regional carriers." The Company also reported that as a percentage of revenue, commissions from carriers, which were critical to GoHealth, decreased from 80.6% of revenue to 76% of revenue year-over-year whereas "other" revenue grew from 19.4% of revenue to 24% of revenue year-over-year. At the same time,

GoHealth's marketing and advertising costs also grew 330% year-over-year to over $21 million in for the fiscal quarter, representing about 17% of GoHealth's total revenues for the period.

134.    Also on August 19, 2020, GoHealth held a conference call with investors and analysts. On the call, regarding the Company's financial results, Defendant Jones stated that they "came in largely as expected," corroborating that the trends were known and began before the IPO. Concerning increased churn, the Company established that customer persistency for the fiscal period was consistent with the Company's "expectations," including, among other things: (1) that in new markets, 90-day customer retention was "as low as 50% to 60%"; (2) that SNP customers "exhibit lower effectuation rates and higher disenrollment rates"; and (3) "higher churn as [Company] agents become educated and fully understand those plans" from new carriers. Notably, Defendant Jones conceded that, "we don't see surprises," and the Company received customer persistency data "in real time."

135.    Also during the earning call, Defendant Jones explained that the Company had taken a "rifle-shot approach to adding new carriers" and that as GoHealth "look[ed] towards 2021," the Company would "have expanded coverage with many of the top carriers, including United, Aetna, Kaiser and some other regional Blues." Defendant Jones also stated that there was "an initial ramp-up period for new carriers with forecasted lower LTVs as agents learn about new plans" and that the short-term expenses would promote the Company's long-term goals for growth.

136.    Also on the call, Defendant Matthiesen stated that the Company's "strategy to add several new, large carriers" would yield "lower initial commission rates and LTVs." Concerning SNPs, Defendant Jones explained that SNPs "tend to have a lower LTV that pull down our average LTV." Also, Defendant Matthiesen stated that GoHealth's growing usage of SNPs, resulted in "lower LTVs," and would "create a near-term drag on [GoHealth's] average LTV" that would

benefit GoHealth "over time." Defendant Matthiesen continued, stating that the Company had carried out a "changing mix of business" in the second quarter of 2020 which would "continue to impact [the Company's] average LTVs[.]"

137. On November 11, 2020, the Company reported its financial results for the fiscal period ended September 30, 2020. The Company reported earnings per share of negative $0.65, which missed estimates by $0.61. Further, the Company reported that it fell short of its revenue estimates by $6.04 million. The Company reported a revenue mix that was significantly different than anticipated, with: (1) commission revenue fell short of analyst estimates by 32%; (2) enterprise revenue (or "other") was about three-times the forecasts, at $62 million versus $20.5 million; and (3) external revenue dropped 27% compared to forecasts of material growth.

138. The Company revealed that, as a percentage of revenue, critical commissions from insurance carriers dropped from 73% of revenues to 62% of revenues in the fiscal period year-over-year, while "other" revenue increased from 27% of revenues to 38% of revenues in the fiscal period year-over-year. At the same time, GoHealth's marketing and advertising costs swelled 121% from $28.5 million to over $62.8 million in the fiscal period year-over-year, representing approximately 39% of GoHealth's total revenues for the fiscal period.

139. On an earnings call to discuss GoHealth's financial results for the third fiscal quarter, Defendant Jones asserted that the Company's platform had driven the direct sales platform of 12 of its carrier partners. Moreover, Defendant Jones stated that, during 2020, the Company added several sizeable insurance carriers, including UnitedHealth Group, Cigna, Aetna, and Allwell. Also on the call, Defendant Matthiesen stated that GoHealth's year-over-year "[c]ommission growth and improved persistency" helped to "push [the Company's] LTVs higher." However, he also explained that LTVs were "offset somewhat by the short-term drag from [the

Company's] carrier expansion as well as [the Company's] growing business with profitable [SNPs.]" Defendant Matthiesen also confirmed that to the extent the Company enjoyed "strong" persistency, it was due to the amplified "scale and effective outreach" by GoHealth's employees, who "ramped up their consumer engagement efforts[.]"

140.    On December 2, 2020, the Company presented at the Evercore ISI HealthCONx Conference. At the conference, in response to an inquiry regarding GoHealth's LTV progression in light of new carrier integrations, Defendant Jones disclosed that the Company had designated 2020 as an "investment year" for the Company and that as a result the Company had prepared to face lower commissions from insurance carriers as well as "LTV compression" in 2020. Defendant Jones further explained that GoHealth would likely not see the "upside" until 2021. Defendant Jones stated the following, in relevant part:

> **So, we anticipated 2020 to be an investment year with new carriers**. If you think about a new carrier, there's technology integrations, there's understanding other compliance and nuances, there's understanding all the different plan options and plan types and building that out. [Indiscernible] side of things. So, there's a -- and we also -- when you add a new carrier, you're typically not -- they don't view you as anybody special, right? **They're going to give you just a normal commission level**. You've got to prove yourself on volume and quality to move up the ranks. **And typically, you'll see LTV compression there because you don't have the top commission rates, which we anticipated, we've modeled out, and we thought that would happen**.

> As we think about where we've gone from a volume standpoint, we quickly rose through the ranks, we've proven ourselves, **and we think there's more upside in 2021 from an LTV standpoint with carriers**. We also know more about their effectuation rates, rapid disenrollment rates, things we can look at in the reporting because other -- every carrier is reporting is different as well.

(Emphasis added.)

141.    Defendant Matthiesen stated that despite higher persistency, GoHealth's plan to add new carriers in 2020 caused a "short-term drag on LTV" and that GoHealth would not achieve

"top-level contracts" with new insurance carriers until "next year," (2021). Defendant Matthiesen

stated the following, in relevant part:

> No. I'll just reiterate what you said, Clint [Jones]. I think we've gotten questions around new carriers, and ***it's important to understand that new carriers really are a short-term drag on LTV*** as you think about it. And again, based off of the volume that we're writing here in AEP for these new carriers, we'll be at those top-tier contracts, so those top-level contracts into next year, which will create more opportunity.
>
> And I think the other part of ***adding those carriers, while it can be a short-term drag on LTV***, we've also seen, and this is what was exhibited in Q3, higher conviction at the point of sale by offering more choice across our carriers. So, we're seeing higher effectuation rates, lower rapid disenrollment rates. And so, as we continue to both create that conviction at the point of sale as well as building out and engaging with our consumers via TeleCare and actually helping them use the benefits that Clint just alluded to earlier. We're finding it's one thing to tell someone that they're in the best plan. It's another for them to actually know it by using all of those benefits. And so, we're seeing those improvements. And that's what caused a little bit of the waterfall we showed in Q3 that, despite the ***short-term drag on these new carrier adds***, we're still seeing higher persistency because of those things I just described.

(Emphasis added.)

142.    On December 2, 2020, the price per share of the Company's Class A common stock

plummeted to an intra-day low of $10.01, over 52.3% lower than the price at the time of the IPO.

This precipitous decline in the price per share of the Company's Class A common stock occurred

in under five months, while the market was rising. Specifically, during the same time, the S&P

500 grew approximately 14%.

## DAMAGES TO GOHEALTH

143.    As a direct and proximate result of the Individual Defendants' conduct, GoHealth

will lose and expend many millions of dollars.

144.    Such expenditures include, but are not limited to, legal fees associated with the

Securities Class Action filed against the Company, its CEO, its CSO, and its CFO, any internal

investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

146.    As a direct and proximate result of the Individual Defendants' conduct, GoHealth has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

147.    Plaintiff brings this action derivatively and for the benefit of GoHealth to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of GoHealth, unjust enrichment, waste of corporate assets, as well as the aiding and abetting thereof.

148.    GoHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

149.    Plaintiff is, and has been at all relevant times, a shareholder of GoHealth. Plaintiff will adequately and fairly represent the interests of GoHealth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

150.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

151.    A pre-suit demand on the Board of GoHealth is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Jones, Cruz, Flanagan, Gayle, Gelber, Pramoda, Tawil, and Timm (the "Director-Defendants") and non-party Rahm Emmanuel ("Emmanuel" and collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

152.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

153.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

154. The Director-Defendants knew of the falsity of the misleading statements at the time they were made as they admitted to during earning calls and presentations given following the IPO, as described herein.

155. As Board members of GoHealth, charged with overseeing the Company's affairs, the Director-Defendants all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of GoHealth, the Director-Defendants must have been aware of the material facts regarding the change in its business model and the resultant negative impacts on the Company's financial performance, as described herein.

156. Therefore, the Director-Defendants each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

157. Additional reasons that demand on Defendant Jones is futile follow. Defendant Jones is the co-founder of GoHealth and has served as the Company's CEO since founding in 2001 and as a Company director since 2020. He also serves as a member of the Nominating and Corporate Governance Committee. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Jones with his principal occupation, and he receives handsome compensation, including $31,664,706 in 2020. As one of the Company's top shareholders, holding 30.2% of combined voting power in the Company, Defendant Jones exercises significant control over the Company. As a trusted Company director and as the Company's CEO during the Relevant Period, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Jones signed, and thus personally made the false and misleading statements in, the Registration Statement that are referenced herein. Further, Defendant Jones is a defendant in the Securities Class Action. For these reasons, too, Defendant Jones breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Cruz is futile follow. Defendant Cruz is the co-founder of GoHealth and has served as the Company's CSO and Special Advisor to the Executive Team since 2010 and as a Company director since 2020. He also serves as the Chairperson of the Compensation Committee. Previously, Defendant Cruz served as the Company's President from 2001 until 2020. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Cruz with his principal occupation, and he receives handsome compensation, including $32,101,235 in 2020. As one of the Company's top shareholders, holding 30.2% of combined voting power in the Company, Defendant Cruz exercises significant control over the Company. As a trusted Company director and as the Company's CSO and Special Advisor to the Executive Team during the Relevant Period, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Cruz signed, and thus personally made the false and misleading statements in, the Registration Statement that are referenced herein. Further, Defendant Cruz is a defendant in the Securities Class Action. Also, Defendant Cruz's brother, Shane E. Cruz ("E. Cruz"), is employed by the Company

and serves as GoHealth's Chief Operating Officer. E. Cruz has received handsome compensation including approximately $12.8 million and $10.9 million in 2020 and 2019, respectively. Demand is futile upon Defendant Cruz because he may fear retaliation against E. Cruz. For these reasons, too, Defendant Cruz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Flanagan is futile follow. Defendant Flanagan has served as a Company director since 2020. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. He receives handsome compensation, including $617,812 in 2020. As a member of the Audit Committee and the Nominating and Corporate Governance Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Flanagan signed, and thus personally made the false and misleading statements in, the Registration Statement that are referenced herein. For these reasons, too, Defendant Flanagan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Gayle is futile follow. Defendant Gayle has served as a Company director since 2020. She also serves as a member of the Nominating and Corporate Governance Committee. She receives handsome compensation, including $222,557 in 2020. As a member of the Nominating and Corporate Governance Committee and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Gayle signed, and thus personally made the false and misleading statements in, the Registration Statement that are referenced herein. For these reasons, too, Defendant Gayle breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Gelber is futile follow. Defendant Gelber has served as a Company director since 2020. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As a member of the Compensation Committee and the Nominating and Corporate Governance Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Gelber signed, and thus personally made the false and misleading statements in, the Registration Statement that are referenced herein. For these reasons, too, Defendant Gelber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Pramoda is futile follow. Defendant Pramoda has served as a Company director since 2020. She also serves as the Chairperson of the Audit Committee. She receives handsome compensation, including $322,559 in 2020. As the Chairperson of the Audit Committee and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading

statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Pramoda signed, and thus personally made the false and misleading statements in, the Registration Statement that are referenced herein. For these reasons, too, Defendant Pramoda breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Tawil is futile follow. Defendant Tawil has served as a Company director since 2020. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Tawil signed, and thus personally made the false and misleading statements in, the Registration Statement that are referenced herein. For these reasons, too, Defendant Tawil breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Timm is futile follow. Defendant Timm has served as a Company director since 2020. He also serves as a member of the Audit Committee. He receives handsome compensation, including $516,180 in 2020. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Timm signed, and thus personally made the false and misleading statements in, the Registration Statement that

are referenced herein. For these reasons, too, Defendant Timm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on the Board is futile follow.

166.    The Director-Defendants, other than Defendant Jones and Cruz, are all beholden to Defendant Jones and Cruz by virtue of each of their 30.2% control of combined voting power in GoHealth and because they depend on the substantial compensation they receive from GoHealth. Moreover, Defendant Jones and Cruz faces a substantial likelihood of liability in the Securities Class Action. As a result, the remaining Director-Defendants are unable to evaluate a demand with independence, and, therefore, demand is excused.

167.    Defendants Flanagan, Pramoda, and Timm (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

168.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Jones and

Cruz co-founded the Company together in 2001. Further, Defendants Gelber and Tawil have served as Managing Directors of Centerbridge together, as Defendant Gelber has served in the role since 2018 and Defendant Tawil since 2012. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

169.    Moreover, since, as of March 31, 2021, Centerbridge owns 121,475,638 shares of the Company's Class A common stock and 80,792,677 of the Company's Class B common stock, representing 38.5% of the combined voting power Centerbridge has significant influence over GoHealth and the directors. Defendants Gelber and Tawil, who work as Managing Directors of Centerbridge, have considerable influence over whether each Board member will retain their seat on the Board in the next Board election. Thus, demand upon the Director-Defendants would be futile since they are beholden to Defendants Gelber and Tawil.

170.    As the Company acknowledges, Defendants Jones and Cruz exercises significant influence over the business polices and affairs of GoHealth, including the size and composition of the Board, any action requiring the approval of the Company's stockholders, including the adoption of amendments to the Company's articles of incorporation and the approval of a merger or sale of substantially all of the Company's assets. The Company acknowledges that the concentration of ownership may also delay or even prevent a change in control of the Company and may make some transactions more difficult or impossible without the support of Defendants Jones and Cruz. Additionally, the Company admits that the interests of Defendants Jones and Cruz may differ from that of other individuals including GoHealth investors. As a result, the Company's Directors are beholden to Defendants Jones and Cruz. Defendants Jones and Cruz control 60.4%

of the Company's combined voting power, consequently, the controlling share of the voting power in the Company as of as of March 31, 2021. Thus, they have considerable influence over whether each Board member will retain their seat on the Board in the next Board election.

171.    All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Directors may not be indemnified for breaching the duty of candor. As a result, all of the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

172.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

173.    GoHealth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for GoHealth any part of the damages GoHealth suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

174.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

175.    The acts complained of herein constitute violations of fiduciary duties owed by GoHealth's officers and directors, and these acts are incapable of ratification.

176.    The Director-Defendants may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of GoHealth. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of GoHealth, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

177.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause GoHealth to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

178.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GoHealth's business and affairs.

181.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

182.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GoHealth.

183.    In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

184.    In further breach of their fiduciary duties owed to GoHealth, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading

statements and omissions of material fact that failed to disclose that: (1) the Company's recent revenue growth and enhanced LTV/CAC metrics highlighted in the Offering Documents were the product of an unmaintainable business approach, i.e., significantly increased focus on only two Medicare insurance carriers; (2) the Company had gotten the most it could have out of the growth to be gained by focusing its business with only Humana and Anthem and, therefore, had to substantially modify GoHealth's business model to maintain a similar level of growth; (3) the Company and the Individual Defendants had designed 2020 to be an "investment year" for GoHealth, which involved substantial and fast carrier expansion in GoHealth's Medicare business along with a heightened dependance on non-commissionable SNPs, both of which would have adverse effects on the Company's key LTV metric; (4) the altered business model and the Company's carrier expansion had caused the Company to command smaller commission rates until it could secure the highest permissible commission rates that GoHealth benefited from with Humana and Anthem, adversely affecting the Company's LTV and causing a "near-term drag" on the Company's average LTV; (5) the altered business model and the Company's carrier expansion had caused the Company to command less marketing assistance from new carriers than it could with Humana and Anthem who sponsored the Company's marketing efforts, adversely affecting the Company's LTV/CAC; (6) the Company's supposed capability to "rapidly scale" was materially false since GoHealth encountered adverse financial dynamics as a result, including lower commission rates and less marketing support with new carriers; (7) to enroll a significant amount of new consumers with GoHealth's new insurance carrier customers, the Company had to incur considerable expenditures such as advertising, marketing, and employee-related costs, which were greater than normal, in consideration for lower commissions, putting pressure on the Company's key LTV/CAC metric and sizeable cash outlays by GoHealth during 2020; (8) as the

Company expanded its large Medicare carriers in 2020, the Company did not have sufficient information to form precise LTV expectations for its new business; (9) the Company's cash outlays due to the new Medicare carriers that GoHealth had previously added and also intended to add later in 2020 would negatively impact LTV/CAC since the Company had to incur significant upfront costs to build up its advertising and marketing and hire more employees to produce a sufficient amount of approved submissions at the new insurance carriers to validate its capacity to earn maximum commissions going forward; (10) the Company faced larger churn and reduced persistency, as well as added expenses in connection to its attempt to thwart rising churn and back persistency, as a result of selling SNPs and new plans for new Medicare carriers since there was a greater chance that customers that were slotted into new plans by inexperienced employees would make a switch in the insurance market, causing lower commissions, diminished profitability, and a "drag" on the Company's LTV/CAC; and (11) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

185.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

186.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of GoHealth's securities.

187.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of GoHealth's securities.

188.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

189.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GoHealth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

190.    Plaintiff on behalf of GoHealth has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GoHealth.

193.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from GoHealth that was tied to the performance or artificially inflated valuation of GoHealth, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

194.    Plaintiff, as a shareholder and a representative of GoHealth, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

195.    Plaintiff on behalf of GoHealth has no adequate remedy at law.

## THIRD CLAIM

### Derivatively Against Individual Defendants for Waste of Corporate Assets

196.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

197.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused GoHealth to waste valuable corporate assets, despite their involvement in the misconduct alleged herein.

198.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

199.    Plaintiffs on behalf of GoHealth have no adequate remedy at law.

## FOURTH CLAIM

### Against the Defendants Jones, Cruz, Matthiesen for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

200. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201. As a result of the conduct and events alleged above, the Company has been named as a defendant in the Securities Class Action brought on behalf of GoHealth shareholders in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

202. Federal law provides GoHealth with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

203. The plaintiffs in the Securities Class Action allege that the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

204. GoHealth is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

205. As issuer of the shares, GoHealth is strictly liable to plaintiffs and the class for the misstatements and omissions alleged in the Securities Class Action.

206. The plaintiffs in the Securities Class Action allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

207. Defendants Jones, Cruz, Matthiesen, because of their positions of control and authority as officers and directors of GoHealth, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of GoHealth, including the wrongful acts complained of herein and in the Securities Class Action.

208.     Accordingly, Defendants Jones, Cruz, Matthiesen are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

209.     As such, GoHealth is entitled to receive all appropriate contribution or indemnification from Defendants Jones, Cruz, Matthiesen.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of GoHealth, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to GoHealth;

(c)     Determining and awarding to GoHealth the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing GoHealth and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GoHealth and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

      2.  a provision to permit the shareholders of GoHealth to nominate at least five candidates for election to the Board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e)     Awarding GoHealth restitution from Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: May 19, 2021        Respectfully submitted,

          /s/ Carl V. Malmstrom
          Carl V. Malmstrom
          **WOLF HALDENSTEIN ADLER**
          **FREEMAN & HERZ LLC**
          111 W. Jackson Blvd., Suite 1700
          Chicago, IL 60604
          Tel: (312) 984-0000
          Fax: (312) 214-3110
          malmstrom@whafh.com

          *Liaison Counsel for Plaintiff*

          Phillip Kim
          **THE ROSEN LAW FIRM, P.A.**
          275 Madison Avenue, 40th Floor
          New York, NY 11771
          Tel: (212) 686-1060
          Fax: (212) 202-3827
          pkim@rosenlegal.com

Timothy Brown
**THE BROWN LAW FIRM, P.C.**
767 Third Avenue
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*